EXCELSIOR HOTEL and Twin City Fire Insurance Company *v.* Larry SQUIRES

CA 03-116                                               115 S.W.3d 823

Court of Appeals of Arkansas
Division IV
Opinion delivered September 3, 2003

*Kilpatrick, Williams, & Meeks, L.P.*, by: *Gene Williams*, for appellant.

*Cortinez Law Firm, PLLC*, by: *Robert R. Cortinez, Sr.*, for appellee.

JOSEPHINE LINKER HART, Judge. Appellants, Excelsior Hotel and Twin City Fire Insurance Company, appeal from the Arkansas Workers' Compensation Commission's finding that appellee, Larry Squires, sustained a permanent anatomical impairment of thirty percent to the body as a whole. On appeal, appellants challenge the sufficiency of the evidence to support this finding and further contend that the Commission did not conduct a *de novo* review of the record. However, because the Commission failed to make specific findings of fact supporting its decision, we cannot conduct a meaningful review of the decision. Consequently, we reverse and remand for further findings of fact.

The parties stipulated that on March 25, 1998, appellee sustained compensable injuries to his ribs and left shoulder during his employment with appellant Excelsior Hotel. Appellants accepted the injuries as compensable and paid temporary total disability benefits from March 26 to June 14, 1998, and appellee returned to work on June 15, 1998. On November 21, 2001, a

hearing was held before the administrative law judge on the issue of the anatomical impairment rating for appellant's respiratory system.

According to the ALJ's opinion of February 21, 2002, appellee, who performed maintenance work, fractured several ribs on his left side, which resulted in a hemorrhagic pleural effusion, when he fell three or four feet from a ladder and landed on a five-gallon bucket. The ALJ stated that Dr. Jack A. Griebel, Jr., a pulmonologist and critical care specialist, began treating appellee in April of 1998. Further, the ALJ observed that Dr. Griebel testified that he drained the fluid between appellee's lung and chest wall so that appellee's lung could more fully expand and allow normal expiration. In May of 1998, Dr. Griebel suggested that appellee return to light duty work, and he continued to prescribe medication and see appellee through August of 1998.

The ALJ further wrote that Dr. Griebel again saw appellee in January of 1999, when appellee complained of occasional difficulty breathing and had mild expiratory wheezing with maximal expiratory effort while not at rest. The doctor noted that the wheezing was a sign of obstructive lung disease, which would result from smoking or from emphysema. Further, Dr. Griebel noted that appellee had some chronic scarring in his lung base and that fluid and a contused lung could cause scarring. Also, Dr. Griebel explained that appellee had a strong blow to the chest that caused bloody fluid to build up and that it would be possible to have a contused lung concomitant with the fluid.

According to the ALJ, Dr. Griebel saw appellee on May 12, 1999, for shortness of breath, coughing, and occasional wheezing. The doctor concluded that appellee had reactive airway disease syndrome, asthma secondary to pulmonary-contusion syndrome, as a result of his fall and multiple rib fractures. He also opined that appellee had acute bronchitis exacerbating the reactive airway disease syndrome with asthma flair, resolving, and chronic musculoskeletal pain from the scapular and rib fracture injury.

The ALJ stated that in November of 1999, Dr. Griebel opined that appellee suffered from reactive airway disease with probable "overlined" chronic obstructive pulmonary disease. The doctor did not, however, know if the chronic obstructive pulmonary disease was preexisting or if there was any connection to the rib fractures. On August 23, 2000, Dr. Griebel's examination revealed that appellee's thorax was of normal AP diameter, which

indicated that any chronic obstructive lung disease was not "real severe." Dr. Griebel stated that reactive airway disease syndrome could be generated from a pulmonary contusion, a blow to the lung at the time of the trauma, but that he was unable to determine whether appellee had a pulmonary contusion because the pleural fluid would have been hiding it at the time.

The ALJ wrote that on January 8, 2001, Dr. Griebel further opined that appellee had significant obstructive airway defect abnormalities on his pulmonary-function testing, as documented on the values of November 18, 1999, with an FEV1 of 2.13, fifty-three percent of predicted, and that this suggested, by American Medical Association criteria, a permanent impairment of thirty percent to the body as a whole. Dr. Griebel believed that the test was calibrated daily. Further, Dr. Griebel noted that appellee continued to require regular use of inhaled bronchodilator therapy and had some limitation of his lung capacity secondary to pleural thickening and scarring from the severe rib fractures. Dr. Griebel also asserted that it was unclear how much of appellee's current lung impairment, reactive airway disease and chronic obstructive pulmonary disease, was secondary to the trauma. Dr. Griebel did note that appellee was relatively asymptomatic prior to the injury and had been symptomatic after the injury.

Also, according to the ALJ, Dr. Griebel explained that two conditions were included in appellee's impairment rating: reactive airway disease and chronic obstructive pulmonary disease. Dr. Griebel stated that while the chronic obstructive pulmonary disease was not likely to be due to the trauma, the reactive airway disease component could well all be due to the trauma. Further, the doctor stated that it was certainly a possibility that the chronic obstructive pulmonary disease was aggravated by the injury. Dr. Griebel concluded that it would seem a logical conclusion and it was his opinion that if appellee had no symptoms prior to the injury and has symptoms after the injury, there was an aggravation of the chronic obstructive pulmonary disease. Dr. Griebel further stated that if there has been an aggravation of the preexisting condition combined with the reactive airway disease, which was secondary to the injury, the impairment rating would be thirty percent.

After reciting the above testimony, the ALJ stated that the "assumption that there was no prior symptom of [chronic obstructive pulmonary disease] is consistent with the medical record and

[appellee's deposition] testimony." Further, the ALJ noted that in estimating appellee's impairment, Dr. Griebel referred to the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993), and according to one table, a twenty-six to fifty percent moderate impairment of the whole person was justified when FEV1 was between forty-one to fifty-nine percent of predicted. The ALJ wrote that "the only specialist in pulmonology, [appellee's] treating physician, tested him objectively and rendered an opinion consistent with the AMA *Guides.*" The ALJ further stated that "[a]lthough the claimant could possibly have had pulmonary problems related to his smoking, or even to emphysema, [appellee's] testimony and the medical record do not support such an assumption." The ALJ concluded that a preponderance of the evidence supported appellee's request for benefits for permanent anatomical impairment.

Appellants appealed the ALJ's decision to the Commission, and the Commission affirmed the ALJ. In its opinion, the Commission stated that it had "carefully conducted a *de novo* review of the entire record," that the ALJ's findings of fact were correct, that it was affirming the ALJ's decision, and that it adopted his opinion, including his findings of fact and conclusions of law.

On appeal from the Commission's decision, appellants raise three issues. First, appellants argue that there was not substantial evidence that appellee's lung condition resulted from his injury. In making this argument, appellants further assert that there was not substantial evidence that appellee's condition was permanent or that his injury was the major cause of any permanent disability. Second, they argue that there was not substantial evidence that appellee's permanent impairment rating was thirty percent to the body as a whole. In this argument, they also insist that in assessing appellee's permanent impairment rating, the Commission disregarded the criteria set forth in the AMA *Guides.* Appellants also assert that the pulmonary-function tests and other information used to determine appellee's impairment were not objective. And third, appellants argue that the Commission did not conduct a *de novo* review of the record.

■ We must reverse and remand this case to the Commission for further factual findings. The Commission is charged with the duty to make and enter findings of fact and rulings of law. Ark. Code Ann. § 11-9-207(a)(5) (Repl. 2002). When the Commission fails to make specific findings on an issue, it is appropriate that the

case be reversed and remanded for the Commission to make such findings. *Wright v. American Transp.*, 18 Ark. App. 18, 709 S.W.2d 107 (1986).

In *Wright*, the Commission found that the claimant had failed to prove by a preponderance of the evidence her claim for additional medical and temporary total disability benefits. On appeal, this court reversed and remanded because the Commission failed to make specific findings on which it relied to support its decision. We observed that the Commission did not make findings of fact on several matters, including whether the claimant sustained a compensable injury, whether her healing period had ended if there was a compensable injury, whether she was disabled, whether she required further medical services, or whether the job-related injury aggravated a preexisting latent disease. We concluded that absent these findings of fact, we were not in a position to make a meaningful review of the Commission's decision.

In the case at bar, we are faced with a similar dilemma. Because of the absence of several findings of fact, we are not in a position to make a meaningful review of the Commission's decision. In the opinion adopted by the Commission, the ALJ concluded that a preponderance of the evidence supported appellee's request for benefits for a permanent anatomical impairment. In discussing his conclusion, the ALJ stated that the assumption that there was no prior symptom of chronic obstructive pulmonary disease was consistent with the medical record and appellee's deposition testimony, that although the claimant could possibly have had pulmonary problems related to his smoking, or even to emphysema, appellee's testimony and the medical record do not support such an assumption, that a twenty-six to fifty percent moderate impairment of the whole person was justified when FEV1 was between forty-one to fifty-nine percent of predicted, and that Dr. Griebel tested him objectively and rendered an opinion consistent with the AMA *Guides*.

This conclusory discussion, however, leaves several matters unsupported by specific findings of fact. For instance, a "compensable injury" is an "accidental injury causing internal or external physical harm to the body ... arising out of and in the course of employment...." Ark. Code Ann. § 11-9-102(4)(A)(i) (Repl. 2002). The parties stipulated that appellee sustained compensable injuries to his ribs and left shoulder during his employment. While

the ALJ's discussion suggests that appellee also sustained a compensable lung injury arising out of and in the course of employment, neither the ALJ nor the Commission made specific findings of fact to support this conclusion.

Further, "[p]ermanent benefits shall be awarded only upon a determination that the compensable injury was the major cause of the disability or impairment." Ark. Code Ann. § 11-9-102(4)(F)(ii)(a) (Repl. 2002). And "[i]f any compensable injury combines with a preexisting disease or condition ... to cause or prolong disability or a need for treatment, permanent benefits shall be payable for the resultant condition only if the compensable injury is the major cause of the permanent disability or need for treatment." Ark. Code Ann. § 11-9-102(4)(F)(ii)(b) (Repl. 2002). "Major cause" is defined as "more than fifty percent ... of the cause." Ark. Code Ann. § 11-9-102(14)(A) (Repl. 2002). Here, neither the ALJ nor the Commission made specific findings of fact supporting a conclusion that appellee's injury was the major cause of his impairment.

"Permanent impairment" has been defined as any permanent functional or anatomical loss remaining after the healing period had ended. *Johnson v. General Dynamics*, 46 Ark. App. 188, 878 S.W.2d 411 (1994). Further, the AMA *Guides* define "permanent impairment" as an "impairment that has become static or well stabilized with or without medical treatment and is not likely to remit despite medical treatment." The AMA *Guides* further qualify the definition by noting that "[a] permanent impairment is considered to be unlikely to change substantially and by more than [three percent] in the next year with or without medical treatment." Again, there were no specific findings of fact regarding the permanency of appellee's condition.

Further, the Commission was required to adopt an impairment rating guide to be used in the assessment of anatomical impairment, and the Commission has adopted the AMA *Guides* to be used in this assessment. Ark. Code Ann. § 11-9-522(g)(1)(A) (Repl. 2002); W.C.C. Rule 34. The Commission is authorized to decide which portions of the medical evidence to credit and to translate this medical evidence into a finding of permanent impairment using the AMA *Guides*; the Commission may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. *Avaya v. Bryant*, 83 Ark. App. 273, 105 S.W.3d 811 (2003). In the case at bar, neither

the ALJ nor the Commission made, using the criteria found in the AMA *Guides*, any specific findings of fact concerning the assessment of the medical evidence and appellee's impairment rating.[1]

Also, a compensable injury must be established by medical evidence supported by objective findings. Ark. Code Ann. § 11-9-102(4)(D) (Repl. 2002). "Objective findings" are "those findings which cannot come under the voluntary control of the patient." Ark. Code Ann. § 11-9-102(16)(A)(i) (Repl. 2002); *see Emerson Elec. v. Gaston*, 75 Ark. App. 232, 58 S.W.3d 848 (2001). Any determination of the existence or extent of physical impairment must be supported by objective and measurable physical findings. Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2002). Here, the ALJ concluded that the tests were objective; he did not make specific findings of fact to support that conclusion.

While there may be evidence in the record sufficient to support an award of benefits, neither the ALJ nor the Commission made the specific findings of fact necessary for this court to carry out a meaningful review. The failure of the Commission to make these specific findings of fact require reversal and remand of this case.

Finally, "[w]hen deciding any issue, administrative law judges and the commission shall determine, on the basis of the record as a whole, whether the party having the burden of proof on the issue has established it by a preponderance of the evidence." Ark. Code Ann. § 11-9-704(c)(2) (Repl. 2002); Ark. Code Ann. § 11-9-705(a)(3) (Repl. 2002). It is well settled that the Commission reviews an ALJ's decision *de novo*, and it is the duty of the Commission to conduct its own fact-finding independent of that done by the ALJ. *Crawford v. Pace Indus.*, 55 Ark. App. 60, 929 S.W.2d 727 (1996). The Commission does not review the ALJ's decision to determine whether there was substantial evidence to support the ALJ's findings; rather, the Commission makes its own findings in accordance with the preponderance of the evidence. *See Tyson Foods, Inc. v. Watkins*, 31 Ark. App. 230, 792 S.W.2d 348 (1990).

---

[1] And neither the Commission nor the ALJ considered the testing criteria set forth in the AMA *Guides*.

█ We note that the author of the Commission's concurring opinion stated that the ALJ, "who heard the live testimony and observed the demeanor of the witnesses, found credible the claimant's testimony that he was asymptomatic before the fall and that all of his symptoms arose after the fall." First, contrary to the concurrence, there was no live testimony given at the hearing. Second, the passage also suggests that the author of the concurrence may have given some deference to the ALJ's findings of fact. As we held in *Crawford*, the Commission must conduct a *de novo* review of the record and may not give any deference to the findings of the ALJ.[2] Accordingly, we remand to the Commission for specific findings of fact and conclusions of law to support their decision.

Reversed and remanded.

PITTMAN and ROBBINS, JJ., agree.

---

[2] However, should the Commission, after conducting the *de novo* review, find identical facts and reach the same conclusion as the ALJ, it may adopt the ALJ's decision as its own, assuming that the ALJ has made sufficient findings. *Lowe v. Car Care Marketing*, 53 Ark. App. 100, 919 S.W.2d 520 (1996).